# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**MARY ANN BEAUDO o/b/o HML-B**
       **Plaintiff,**

    **v.**                              **Case No. 22-C-1472**

**KILOLO KIJAKAZI,**
**Acting Commissioner of the Social Security Administration**
       **Defendant.**

## DECISION AND ORDER

Plaintiff Mary Ann Beaudo applied for social security disability benefits on behalf of her grandson and ward, HML-B, and the agency found him disabled under Listing 112.10 (autism spectrum disorder). After the agency determines that a child is disabled, there is a statutory requirement that the case be periodically reviewed to determine whether the child remains eligible for benefits. To ascertain continued eligibility, the agency first determines whether there has been "medical improvement" in the child's impairment. 20 C.F.R. § 416.994a(a)(1). If so, then the agency considers whether the impairment the child had at the time of the previous favorable decision continues to meet or equal the severity of the Listing it met or equaled at that time. Id. If not, the agency determines whether the child's current impairments are disabling, id., i.e., whether those impairments meet, medically equal, or functionally equal one of the listed impairments, 20 C.F.R. § 416.924(d). For a child's impairments to functionally equal a Listing, they must produce two "marked" or one "extreme" limitation in six "domains" of functioning: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being. 20 C.F.R. § 416.926a(d).

When the agency reviewed this case several years later, it determined that HML-B had medically improved and was no longer disabled. Plaintiff requested a hearing before an Administrative Law Judge (ALJ), but the ALJ agreed disability had ended. Under the domains, the ALJ found no limitation in acquiring and using information; less than marked limitations in attending and completing tasks, getting along with others, moving about and manipulating objects, and health and physical well-being; and marked limitation in caring for oneself.

In this action for judicial review, plaintiff argues that the ALJ erroneously evaluated HML-B's symptoms and otherwise overlooked evidence supporting a marked limitation in interacting and relating with others. While the ALJ could have reached a different conclusion, her decision was adequately explained and supported by substantial evidence; accordingly, under the deferential standard of review, the ALJ's decision will be affirmed.

## I. FACTS AND BACKGROUND

### A. Agency Decisions

In May 2017, as his grandparent/guardian, plaintiff applied for benefits on behalf of HML-B, then three years old, based on autism, attention deficit hyperactivity disorder (ADHD), and learning disabilities. (Tr. at 293-300, 301-04.) On June 14, 2017, the agency found HML-B disabled as of April 17, 2017, based on autism spectrum disorder (ASD) under Listing 112.10. (Tr. at 109-17.) In granting the application, the agency substantially relied on a March 2017 psychological evaluation by Eric Lund, Psy.D. Dr. Lund diagnosed autism spectrum disorder, noting delays in communication; sensitivity to sounds, tastes, and textures; and inflexible adherence to routines. HML-B showed significant restrictive repetitive behaviors in his hand flapping, his need for routine, and his resistance to parental authority. He also showed

2

significant social delays in interacting with other children. (Tr. at 435-38.) The agency reviewer, Frank Orosz, Ph.D., noted a history of autism with language delay, over-sensitivity, resistence to potty training, and unawareness of dangerous situations. HML-B did not seek out other children to interact with, and eye contact was problematic in social situations. (Tr. at 114.)

In 2020, the agency commenced a continuing disability review. In an August 2020 report, plaintiff wrote that they had no success in getting HML-B to bathe, brush his teeth, or use the toilet. (Tr. at 316.) She further indicated that he needed to get to know people before interacting with them (Tr. at 317); that he experienced angry outbursts when criticized, disciplined, or frustrated (Tr. at 318); and that he was on medication to help with focus (Tr. at 319). In a September 2020 report, plaintiff wrote that HML-B's dentist needed to use anesthesia to perform any dental work (Tr. at 329), and they had to use bribery to get him to bathe (Tr. at 332).

In February 2021, HML-B's first grade teacher completed a questionnaire, noting no problems in any of the domains. (Tr. at 335-40.) She wrote that he was autistic and wore a pull-up, but this did "not impact his experience/functioning at school." (Tr. at 341.) She concluded: "[HML-B] thrives in school. One would never know about his conditions based off the interactions he has with others, his behavior, & his intelligence. He is a well-mannered, respectful, kind & sociable child. He has no issues at school with his conditions." (Tr. at 341.)

In April 2021, HML-B underwent a mental status evaluation with Jesse Frey, Psy.D., on referral from the agency. (Tr. at 500.) In the domain of acquiring and using information, Dr. Frey noted that HML-B's cognitive abilities were within normal limits; he was shy/reserved but spoke as needed. In the area of attending and completing tasks, he showed age-appropriate attentional abilities and ability to play independently with other children, completed all necessary

3

tasks, and did not require excessive adult supervision. Regarding the third domain, HML-B interacted with other children in an aggressive manner but showed appropriate interaction with familiar adults. He was very shy and reserved; when things did not go his way, he had difficulty dealing with disappointment, throwing tantrums. He displayed no notable difficulty moving about and manipulating objects. However, in the area of caring for oneself, he was unable to complete age-appropriate activities, e.g., toileting, brushing, bathing, and dressing. (Tr. at 501.) Regarding physical well-being, he appeared to be a healthy child. He was attending school, in the first grade, with no IEP[1] and no behavioral issues. (Tr. at 502.) Dr. Frey concluded:

> [HML-B] has a previous diagnosis of autism. Symptoms of this are less prevalent now than in the past. Treatment has been effective. Notable symptoms that continue to exist: social avoidant, difficulty with reciprocity of conversation, social anxiety, difficulty with change, new environments, new people. While he was initially nervous and hesitant, he was able to adapt. He complied with testing, provided his best effort. Child is doing very well in his academics. He is a good reader, he has good reading comprehension. All academic abilities are average to above average. [HML-B] is reported to have significant difficulty with peer interactions. He has few friends. He tends to be uncooperative in play. He is forceful, can be aggressive. He is treated for ADHD with adequate results.

(Tr. at 503.) Dr. Frey diagnosed autism spectrum disorder, level 1, without language or intellectual impairments, and ADHD, combined type, moderate, in partial remission, with a good prognosis. He opined that the primary diagnosis was likely to improve with motivated participation in treatment and medications, but unlikely to improve without proper assistance. (Tr. at 503.)

On May 4, 2021, the agency determined that disability ceased as of May 3, 2021, when

---

[1]An individualized education program (or IEP) is a written statement for a student with a disability that is developed, reviewed, and revised by a team of people, including the student's family, that outlines an educational plan for the student. https://dpi.wi.gov/families-students/student-success/ccr-iep.

HML-B was seven years old. (Tr. at 118, 139.) The agency reviewer, Cathy Propper, Ph.D., noted that HML-B's teacher documented no limitations in any domain. He did wear pull-ups, but this did not impact his experience or functionality. The April 2021 consultative evaluation showed age-appropriate attentional abilities, age-appropriate ability to play with another child, and the ability to work on an academic task without excessive adult supervision. (Tr. at 120.) He was not toilet trained and did not brush his teeth or bathe independently. Behavioral problems were not an issue at school, and he did not have an IEP. Dr. Propper concluded that HML-B had shown medical improvement: his social skills and behavior at school improved, he did not have language deficits anymore, and the teacher noted no problems in any domain. Dr. Propper found marked limitation in domain 5, less than marked limitation in domain 3, and no limitations in domains 1, 2, 4 and 6. (Tr. at 121-122.)

Plaintiff requested reconsideration. (Tr. at 143-44.) In a June 2021 report, she wrote that school was about to let out, which would require a major change in HML-B's routine; she predicted he would act out until he got back into a schedule. She indicated he did not handle change well and would experience sensory overload with a schedule modification. She further wrote that he was very sensitive to touch, including water and clothes. He also had problems with sensitivity to sound and bright light in stores. He had no sense of boundaries, was overly aggressive, and got distracted easily without his medications. (Tr. at 355.)

In August 2021, Susan Donahoo, Psy.D., reviewed the matter and agreed disability had ended. She noted that at the time of the comparison point decision (CPD) HML-B was three, displaying significant symptoms related to ASD and ADHD. He was not in school or on medications at that time. He was now seven years old, and medication had been helpful; he no longer had problems with focus or hyperactivity. His grandmother continued to report

5

behavioral problems with frequent tantrums at home, but he was not displaying any behavioral problems at school, and his academics were above average.  Dr. Donahoo concluded that the evidence established medical improvement, and his conditions no longer met, equaled, or functionally equaled a Listing.  (Tr. at 128.)  Dr. Donahoo found no limitations in domains 1, 2, 4 and 6, and less than marked limitations in domains 3 and 5.  (Tr. at 129-30.)

The agency affirmed the cessation on reconsideration.  (Tr. at 132, 137, 150.)  Plaintiff requested further review, but in a September 2021 decision, a disability hearing officer agreed benefits should end.  (Tr. at 152-57.)  In November 2021, plaintiff requested a hearing before an ALJ.  (Tr. at 164.)

**B.    ALJ Hearing**

On April 26, 2022, the ALJ convened a video hearing, at which plaintiff and HML-B appeared, represented by counsel.[2]  (Tr. at 78-79.)  HML-B, then eight years old, testified that he lived with his grandparents and was in the second grade at school.  (Tr. at 81-82.)  He said he was doing good in school and got along with his teachers and classmates.  He was not in special classes and did not have a special teacher help him with learning.  (Tr. at 83.)  He was not in clubs or activities at school.  (Tr. at 83.)  He liked to play soccer outside with his friends.  (Tr. at 84.)  He clarified that he played soccer at recess at school; away from school, he did not play with others outside.  (Tr. at 85.)  He testified that he had problems with other students but did not want to tell the ALJ what they were.  (Tr. at 86.)  Asked what he did at home, he said he played video games or rode his bike by himself.  He was able to dress himself and get ready

---

[2]The agency collected HML-B's medical records prior to the hearing, and plaintiff's counsel agreed the record was complete.  (Tr. at 80.)  I summarize the pertinent medical evidence in an appendix to this decision.

6

for school but often did not brush his teeth. (Tr. at 87-88.) He was able to participate in gym class but did not help his grandmother around the house. (Tr. at 88.)

Plaintiff testified that HML-B was in the second grade, in regular classes, receiving no special services. He was not potty trained. She had not been able to get him an IEP; the school indicated he was not eligible for one. (Tr. at 92.) Plaintiff testified that for the most part he was doing well academically. (Tr. at 92-93.) He had not received any disciplinary actions. She had been alerted to an issue where he was fighting with other students and broke a girl's cup. They increased his medications, and the teacher said he was doing 100% better. He got along with his teacher and participated in gym class. (Tr. at 93.) He also got along with his grandparents but did not like discipline and did not help around the house. (Tr. at 94.) He had friends at school but no one around home to play with. He spent time riding his bike and playing video games. (Tr. at 94.) He still was not potty trained and used pull-ups; the school was working with her on it. (Tr. at 95.) He took a variety of medications. (Tr. at 96.) With increasing dosages he had been doing better. He did have issues with anger where he would pound on the walls and hit her on the back. This did not happen at school. (Tr. at 98.) He had anger outbursts at home daily. He did not like being told no and had an outburst if he did not get his way. The main issue was he was not potty trained. (Tr. at 99.) He also did not like baths and brushing his teeth. (Tr. at 99-100.) He had frequent ear infections, with tubes placed in his ears twice. (Tr. at 100.)

Plaintiff further testified that HML-B really did not have any friends because he got angry often and was verbally mean to them. He played with kids at school, but they never came over to his house. (Tr. at 102.) They had great difficulty with him being examined by medical providers he did not know. (Tr. at 103.) He also flapped his arms and chewed on his shirt

7

when anxious or nervous.  (Tr. at 104.)

## C.     ALJ's Decision

On May 23, 2022, the ALJ issued an unfavorable decision.  (Tr. at 12.)  The ALJ noted that HML-B had previously been found disabled as of April 17, 2014.  (Tr. at 15.)  On May 4, 2021, the agency reevaluated the matter and found him no longer disabled as of May 3, 2021. (Tr. at 15.)  At the time of the CPD, HML-B had the medically determinable impairment of autism spectrum disorder, which was found to meet Listing 112.10.  However, the ALJ found that medical improvement occurred as of May 3, 2021.  (Tr. at 18.)  The ALJ noted that at the time of the CPD, HML-B had significant deficits in his ability to communicate and interact with others.  In March 2017, an examiner noted significant restrictive repetitive behaviors and significant social delays.  However, the updated record included a report from HML-B's first-grade teacher, who described him as well mannered, respectful, and sociable.  Further, an April 2021 consultative examination report indicated that he had age-appropriate attention abilities and social interactions, and he was able to work independently.  While he continued to have difficulty handling frustration and managing personal care, he did not have behavioral issues in the school setting.  The examiner noted that HML-B's treatment for autism had been effective, and his symptoms were less prevalent than they had previously been.  (Tr. at 19.)

The ALJ next concluded that plaintiff's ASD did not meet or medically equal Listing 112.10, as the record failed to document qualitative deficits in verbal communication, nonverbal communication, and social interaction; and significantly restricted repetitive patterns of behavior, interests or activities, resulting in one extreme or two marked limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.  The ALJ noted that while

8

HML-B continued to have some issues in the home environment, his teacher had not observed problems at school.  (Tr. at 19.)

The ALJ further determined that HML-B's autism did not functionally equal a Listing.  (Tr. at 19-20.)  The ALJ found no limitation in acquiring and using information; less than marked limitations in attending and completing tasks, interacting and relating to others, moving about and manipulating objects, and health and physical well-being; and marked limitation in caring for self.  (Tr. at 20.)  In reaching this conclusion, the ALJ relied on the April 2021 consultative examination report, indicating treatment for autism had been effective and symptoms were less prevalent.  Persisting symptoms were noted as social avoidance, difficulty with reciprocity of conversation, social anxiety, and difficulty with change, new environments and new people.  However, HML-B was observed to adapt to the exam after initial nervousness and hesitation.  This evaluation, combined with the observations of HML-B's teacher, supported a finding that while HML-B continued to experience limitations in functioning, his impairment did not meet the severity required.  (Tr. at 20.)

The ALJ next determined that, since May 3, 2021, HML-B had the severe impairments of ASD, ADHD, anxiety disorder, sensory integration disorder, oppositional defiant disorder (ODD), enuresis, and encopresis.  (Tr. at 20.)  However, the ALJ found that none of those impairments met or medically equaled Listing 112.00.  The evidence failed to demonstrate one extreme or two marked limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.  The record reflected that HML-B engaged in a range of age-appropriate activities, including attending school in regular education classes, doing well academically, engaging appropriately with peers at school, and spending time playing outdoors and video

9

games indoors.  (Tr. at 21.)

The ALJ next determined that, since May 3, 2021, plaintiff's combined impairments did not functionally equal the Listings.  In reaching this conclusion, the ALJ considered HML-B's symptoms and the medical opinion evidence.  (Tr. at 21.)

In considering the symptoms, the ALJ noted the required two-step process, under which she first had to determine whether there was an underlying medically determinable impairment that could reasonably be expected to produce the symptoms.  Second, once such an impairment had been shown, the ALJ had to evaluate the intensity, persistence, and limiting effects of the symptoms.  For this purpose, if the statements were not substantiated by objective medical evidence, the ALJ had to make a finding on the consistency of the symptoms based on consideration of the entire case record.  (Tr. at 21.)

Plaintiff asserted that HML-B continued to be disabled due to autism and a sensory processing disorder.  (Tr. at 21.)  In an August 2020 function report, she indicated that HML-B's impairments did not affect his ability to communicate or progress in learning, but that he became anxious when interacting with unfamiliar people, experienced frustration and uncontrollable anger, had difficulty with personal care (bathing, teeth brushing, toileting) due to sensory issues, and took medication for focus and attention.  Plaintiff testified that HML-B continued to have issues with peers at school and exhibited nervous behaviors such as flapping his arms and chewing on his shirt.  (Tr. at 22.)

The ALJ determined that while HML-B's medically determinable impairments could reasonably be expected to produce the alleged symptoms, the statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the objective medical and other evidence of record.  (Tr. at 22.)

10

In support of this conclusion, the ALJ first reviewed the medical records, which documented diagnoses of ADHD, sensory processing disorder, ODD, anxiety disorder, and autism disorder. The record reflected that prior to May 2021 HML-B's symptoms were being managed with medications and in-home therapy services. In spring 2021, he attended therapy to address toileting issues and anger management. April 2021 medication management notes indicated he was generally doing well in school but experienced anxiety at home, believed to be associated with changes in his home environment. His medications were adjusted. An April 2021 well-child exam noted that HML-B continued to have issues with sleep and incontinence but no problems with physical activity; plaintiff did not have concerns regarding his behavior, and he was doing well socially. May 2021 therapy notes indicated that he had appropriate and calm mood and was making good progress towards goals. June 2021 medication management notes documented an adjustment in ADHD medication to address morning symptoms, including irritability and lack of focus. (Tr. at 22.)

HML-B attended a pre-evaluation for a psychological assessment in July 2021. There, plaintiff reported concerns regarding toileting and anger issues. She indicated that he had meltdowns once or twice per day in response to being told no, and that she often had to bribe him for cooperation. She also reported that he was not potty trained, used a pull-up, and this caused issues at school. The provider noted that HML-B was restless and irritable but had adequate speech, logical thought content, good memory, average intelligence, and fair judgment. The provider further noted that HML-B would be scheduled for a psychological assessment and would benefit from an IEP at school. (Tr. at 22.)

However, HML-B's first grade teacher completed a questionnaire in February 2021 indicating that she had not observed him to have any problems in any domain of functioning.

11

She had known HML-B for five months and spent seven hours per school day with him in a classroom setting of 15 children.  (Tr. at 22.)  While she acknowledged his autism and use of a pull-up at school, she indicated this did not impact his experience or functioning at school.  (Tr. at 22-23.)  She also noted that HML-B "thrives in school" and one would never know about his conditions based off his interactions, behavior, or intelligence.  She described him as a "well-mannered, respectful, kind, and sociable child" with no issues at school due to his conditions.  (Tr. at 23.)  The ALJ found the teacher's observations and assessment persuasive as to HML-B's functioning in the school environment given the extent of her contact with him.  (Tr. at 23.)

October 2021 and January 2022 medication management notes documented ongoing issues with toileting, with continued use of a pull-up in second grade.  However, the October 2021 notes also documented continued effectiveness of ADHD medication, as well as improvement in aggressive behaviors at home and overall mood.  While January 2022 notes documented some mood variability and behavioral issues at home, there had not been reports from school regarding issues with attention and concentration.  HML-B's medications were adjusted to address mood issues.  February 2022 correspondence from his psychiatrist indicated that he continued to work on toilet training.  Finally, while March 2022 correspondence from HML-B's dentist indicated that he required general anesthesia to safely complete treatment due to autism and behavioral issues, the record also reflected that during a March 2022 ear exam and audiogram he was pleasant and appropriate.  Plaintiff testified that his issues continued to be managed with medication, with adjustments as necessary.  (Tr. at 23.)

In sum, the ALJ stated, the medical records documented diagnoses of and treatment for various mental impairments, as well as ongoing issues with enuresis and encopresis.  While

12

plaintiff's observations were persuasive as to HML-B's behavior in a home environment, there was no objective evidence as to any significant issues in the school environment. Rather, the record showed that he attended school in a regular education classroom and, despite plaintiff's request, had not been referred for IEP evaluation. While he did not participate in sports or clubs, he got along with teachers and classmates, participated in gym class, and played soccer with friends during school recess. The record reflected continued issues with toileting due to sensory issues; however, plaintiff testified that the school was working with her on the issue, and there was no indication it had resulted in any significant limitations in his activities. (Tr. at 23.)

Based on the overall evidence, the ALJ found that, since May 3, 2021, HML-B's impairments resulted in the following limitations in the six domains. As to his ability to acquire and use information, plaintiff did not allege—and the evidence did not support—any limitation. The April 2021 consultative exam noted that he did very well in academics, and his first grade teacher observed no problems in this domain. (Tr. at 23.) January 2021 standardized testing placed him in the 90th percentile in reading and 75th percentile in math. (Tr. at 23-24.) October 2021 treatment notes documented plaintiff's report that HML-B would have been considered for grade advancement based on intellectual ability. (Tr. at 24.)

The ALJ found less than marked limitation in attending and completing tasks. The consultative examiner observed in April 2021 that HML-B had age-appropriate attentional abilities, and his first grade teacher noted no problems in this domain. Further, October 2021 treatment notes documented adequate attention and concentration with ADHD medication. However, the ALJ found plaintiff's report that HML-B had difficulties completing household chores and required supervision in tending to personal care warranted a finding of some

13

limitation in this domain. (Tr. at 24.)

The ALJ also found less than marked limitation in getting along with others. Plaintiff reported that HML-B could be argumentative at home, had a hard time making friends, and preferred to spend time alone. However, HML-B's teacher did not observe him to have any difficulties in this domain, stating that he was well-mannered, respectful, kind, and sociable. Further, HML-B testified that he plays soccer with friends at recess. Thus, while he had some limitation in this domain, it was less than marked. (Tr. at 24.)

The ALJ also found less than marked limitation in moving about and manipulating objects. While HML-B was noted to have balance issues when riding a bike and to be unable to tie shoes independently, the consultative examiner noted that he demonstrated normal fine and gross motor skills during his assessment. (Tr. at 24.)

The ALJ also found less than marked limitation in health and physical well-being. HML-B's medical records indicated that he was generally healthy but had ongoing issues with enuresis, encopresis, and sleep. His teacher indicated these issues, particularly his use of a pull-up, had not caused problems at school, but more recent records reflected a recommendation by the school nurse for potty training. (Tr. at 24.)

The evidence demonstrated that HML-B's greatest area of limitation was in his ability to care for himself. Plaintiff reported that he had significant difficulties tending to personal care, including bathing, brushing teeth, and toileting due to sensory issues. She further reported that he had difficulty managing his emotions and would hit, kick, and throw things if disappointed. His dentist also noted a need for general anesthesia for dental work. (Tr. at 24.) While plaintiff testified that HML-B was generally getting along well at home at that time, January 2022 treatment notes documented continued reports of impulsivity and aggressive behaviors toward

14

her. (Tr. at 24-25.) The ALJ found HML-B's toileting issues and history of anger issues in the home environment warranted a finding of marked limitation in this domain. (Tr. at 25.)

As for the medical opinions, the ALJ found persuasive the May 2021 and August 2021 reports of the agency consultants, Drs. Propper and Donahoo. They opined that HML-B had no limitations in acquiring and using information, attending and completing tasks, moving about and manipulating objects, and health and physical well-being, and less than marked limitation in interacting with others. Dr. Propper found a marked limitation in caring for onself, while Dr. Donahoo assessed less than marked limitation in this domain. The ALJ found that these opinions were largely consistent with the overall evidence and appropriately balanced HML-B's treatment history, plaintiff's observations and concerns, clinical observations of some abnormalities in mental status (e.g., irritability, restlessness), and ongoing toileting issues with the observations of HML-B's teacher, attendance in a regular education classroom, and reported improvements in symptoms with medications. While HML-B experienced limitations in function due to his severe impairments, the overall evidence as to the severity of these limitations was not consistent with a finding of continued disability. (Tr. at 25.)

The ALJ also considered the July 2021 opinion of Dr. Ashley Sheeter that HML-B would benefit greatly from having an IEP. However, Dr. Sheeter's recommendation was unpersuasive as to the issue before the ALJ, as it was vague and lacked a function-by-function analysis as to areas of need. (Tr. at 25.)

The ALJ concluded that HML-B's disability ended as of May 3, 2021, and he had not become disabled again since that date. (Tr. at 25.) On October 6, 2022, the Appeals Council denied plaintiff's request for review (Tr. at 1), making the ALJ's decision the final decision of the Commissioner. See Baptist v. Kijakazi, 74 F.4th 437, 441 (7th Cir. 2023). This action followed.

15

## II. DISCUSSION

### A.    Standard of Review

The court will uphold an ALJ's decision if it uses the correct legal standards, is supported by substantial evidence, and builds an accurate and logical bridge from the evidence to the conclusion.  Jeske v. Saul, 955 F.3d 583, 587 (7th Cir. 2020).  "Substantial evidence" means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Wilder v. Kijakazi, 22 F.4th 644, 651 (7th Cir. 2022).  The court may not, under this deferential standard, substitute its judgment for that of the ALJ, re-weigh the evidence, or decide questions of credibility.  Milhem v. Kijakazi, 52 F.4th 688, 694 (7th Cir. 2022).  If reasonable minds could differ over whether the claimant is disabled, the court must affirm the ALJ's decision denying the claim if the decision is adequately supported.  Jarnutowski v. Kijakazi, 48 F.4th 769, 773 (7th Cir. 2022).  Finally, while the ALJ must adequately explain her conclusions, she need not address every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability.  Combs v. Kijakazi, 69 F.4th 428, 435 (7th Cir 2023); see also Deborah M. v. Saul, 994 F.3d 785, 788 (7th Cir. 2021) (explaining that, while the ALJ must confront contrary evidence, she need not address every single piece of relevant evidence that cuts against her decision and is prohibited only from ignoring a line of evidence supporting disability).

### B.    Plaintiff's Arguments

#### 1.    Symptom Evaluation

In determining whether a claimant is disabled, an ALJ must consider all symptoms and

16

the extent to which those "symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 416.929(a). SSR 16-3p sets forth a two-step process for symptom evaluation. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2016 SSR LEXIS 4, at *5. Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to function. Id. at *9. In considering the limiting effects of the claimant's symptoms, the ALJ examines the entire case record, including the objective medical evidence, the claimant's statements about the symptoms, and statements and other information provided by medical sources and other persons. Id. at *9-10. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Id. at *26. "As long as an ALJ gives specific reasons supported by the record, [the court] will not overturn a credibility determination unless it is patently wrong." Grotts v. Kijakazi, 27 F.4th 1273, 1279 (7th Cir. 2022).

In the present case, the ALJ stated:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the statements concerning the intensity, persistence and limiting effects of the claimant's symptoms are not entirely consistent with the objective medical and other evidence for the reasons explained below.

(Tr. at 22.)

Citing decisions from the Seventh Circuit and this court, plaintiff contends that such

17

"meaningless boilerplate" is unacceptable. (Pl.'s Br. at 11.) However, the Seventh Circuit has clarified that the use of "boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." Burmester v. Berryhill, 920 F.3d 507, 510 (7th Cir. 2019) (internal quote marks omitted); see also Lacher v. Saul, 830 Fed. Appx. 476, 478 (7th Cir. 2020) ("[T]he phrase 'not entirely credible' (or 'not entirely consistent') is meaningless only when the ALJ gives no legitimate reasons for discrediting the claimant's testimony."). Accordingly, as judges in this district have noted, "'Plaintiffs would do better to forgo challenging the boilerplate and instead focus on what the ALJ actually does in the decision.'" Wood v. Kijakazi, No. 22-CV-627, 2023 U.S. Dist. LEXIS 14956, at *19 (E.D. Wis. Jan. 30, 2023) (quoting Seibel v. Saul, No. 19-CV-643, 2020 WL 1812448, at *7 (E.D. Wis. Apr. 8, 2020)).

Plaintiff further argues that by requiring the statements be "entirely consistent" with the medical evidence and that medical evidence "fully substantiate" the statements, the ALJ committed an error of law by applying a more stringent test than required by the regulations. (Pl.'s Br. at 12, 21; Pl.'s Rep. Br. at 12.) The ALJ never said the statements had to be "fully substantiated" by the medical evidence; rather, she found the statements not entirely consistent with the objective medical and other evidence of record. Moreover, the Seventh Circuit has rejected the argument that use of the phrase "not entirely consistent" means the ALJ applied an improperly heightened standard:

> The ALJ found Gedatus's statements about her symptoms to be "not entirely consistent with the medical evidence and other evidence for the reasons explained in this decision." She criticizes the ALJ for applying the wrong standard. She argues the language "are not entirely consistent" means the ALJ required the evidence to be entirely consistent with her claims about her symptoms before he would accept her claims, and did not use the appropriate preponderance-of-the-evidence standard. But we do not read the ALJ's language

18

that way. It is clear to us, given the context, that the ALJ merely used a polite way to say the weight of the evidence did not support all her claims.

Gedatus v. Saul, 994 F.3d 893, 900 (7th Cir. 2021). I read the decision here the same way, particularly given the ALJ's recitation of the standards from 20 C.F.R. § 416.929 and SSR 16-3p earlier in the opinion. (Tr. at 21, "the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence".)[3] See Harris v. Saul, 835 Fed. Appx. 881, 886 (7th Cir. 2020) ("[E]ven though the 'entirely consistent' language is boilerplate, the ALJ's recitation of it is harmless because he described (and applied) the correct standard of whether Harris's statements about her symptoms were substantiated by the objective medical evidence and other evidence in the record."). Plaintiff also cites caselaw criticizing the boilerplate for failing to indicate which statements are not credible and what exactly "not entirely" is meant to signify. (Pl.'s Br. at 11; Pl.'s Rep. Br. at 11.) But the Seventh Circuit has clarified that "an ALJ's credibility findings need not specify which statements were not credible." Shideler v. Astrue, 688 F.3d 306, 312 (7th Cir. 2012).

Plaintiff contends that the ALJ's later discussion suggests she believed the statements could be discounted if the record contained any evidence (here, the teacher's report) inconsistent with the statements. (Pl.'s Br. at 13.) To be sure, the ALJ found the teacher's

_____

[3]Plaintiff cites district court cases in which the ALJ referenced inconsistent standards for evaluating the claimant's subjective symptoms. (Pl.'s Br. at 12-13; Pl.'s Rep. Br. at 12-13.) However, plaintiff points to no such inconsistency in the decision here. In reply, plaintiff contends the matter must be remanded so the ALJ can apply the proper legal standard. (Pl.'s Rep. Br. at 15.) As indicated in the attached text, the ALJ cited the correct standards from § 416.929 and SSR 16-3p, and the Seventh Circuit has rejected the argument that the "not entirely consistent" phrasing constitutes legal error. Plaintiff offers no reply to the Commissioner's citation of Gedatus on this issue. (See Def.'s Br. at 10.)

report significant, but she also cited other evidence in reaching her conclusion, including the treatment records, the April 2021 consultative exam, and the opinions of the agency psychological consultants.

Plaintiff next contends that the ALJ "wholly relied" on the opinions of Drs. Propper and Donahoo, who never treated HML-B and were not present at the hearing to hear the testimony. (Pl.'s Br. at 13.) Again, the ALJ considered various pieces of evidence, not just the consultants' reports. Moreover, the ALJ's findings under the domains were somewhat more restrictive than the consultants' findings, "illustrating reasoned consideration given to the evidence [plaintiff] presented." Burmester, 920 F.3d at 510. Plaintiff suggests that reliance on the consultants' opinions violated her due process rights (Pl.'s Br. at 14), but she cites no authority for the proposition that doctors must appear at social security hearings in order for their reports to be credited. See Richardson v. Perales, 402 U.S. 389, 402 (1971) (holding that written reports by physicians could be received as evidence in a social security hearing and used as substantial evidence to deny benefits despite their hearsay character and the absence of cross-examination). Indeed, the regulations required the ALJ to explain how persuasive she found these prior administrative medical findings. 20 C.F.R. § 416.920c. Plaintiff develops no argument that the ALJ erroneously evaluated these findings under the regulatory factors. Nor does plaintiff point to any language in the ALJ's decision suggesting she believed a simple tally of negative and positive exam findings would suffice to discredit the allegations. (See Pl.'s Br. at 14.)

Plaintiff does contest the ALJ's finding that the consultants' reports "appropriately balance[d]" the evidence. (Pl.'s Br. at 14; Tr. at 25.) But weighing the evidence is the ALJ's job, not the court's, so plaintiff faces an uphill climb in demonstrating error on this basis.

20

Plaintiff quotes from Dr. Frey's discussion of the domain of interacting and relating to others, e.g., that HML-B interacted with other children in an aggressive manner, threw tantrums when things did not go his way, and displayed social anxiety; plaintiff asks, "What of all these findings?" (Pl.'s Br. at 14-15.) The ALJ discussed Dr. Frey's report, including its documentation of persistent symptoms such as social avoidance, difficulty with reciprocity of conversation, social anxiety, and difficulty with change. (Tr. at 20.) However, Dr. Frey also noted that HML-B's treatment for autism had been effective, his symptoms were less prevalent, and he was able to adapt to the examination after initial nervousness and hesitation. (Tr. at 20.) The ALJ was not required to comment on every line of Dr. Frey's report, see Schwartz v. Kijakazi, No. 22-CV-00321-SCD, 2023 U.S. Dist. LEXIS 56099, at *19 (E.D. Wis. Mar. 31, 2023) ("In effect, Schwartz suggests that the regulations require the ALJ to mine every medical opinion for every possible factual nugget that supports the claimant's position."), and plaintiff develops no argument that Dr. Frey's observations compelled a marked finding in this domain, see Gedatus, 994 F.3d at 900 ("We will reverse only if the record compels a contrary result.") (internal quite marks omitted).

Plaintiff argues that the consultants improperly relied on the teacher's report to find her allegations only "partially consistent" with the evidence in the file; she also faults the consultants for failing to acknowledge the medical opinion from the consultative examiner. (Pl.'s Br. at 15; Tr. at 124, 130, 137.) But "I am reviewing the ALJ's decision, not the consultants' opinions," Moyer v. Kijakazi, No. 21-1572, 2023 U.S. Dist. LEXIS 143307, at *45 (E.D. Wis. July 18, 2023) (citing Grotts, 27 F.4th at 1278), so any flaws in those opinions do not compel remand. Plaintiff similarly criticizes the hearing officer's assessment of the testimony and Dr. Frey's report (Pl.'s Br. at 15-16), but again, the ALJ's decision represents the final decision of the Commissioner

for purposes of judicial review; any flaws in prior administrative findings do not require remand.

Plaintiff acknowledges that the use of boilerplate can be overlooked if the ALJ otherwise provides specific reasons for her finding.  (Pl.'s Br. at 16; Pl.'s Rep. Br. at 13.)  Plaintiff quotes the following passage from the decision:

> In sum, the claimant's medical records document diagnoses of and treatment for various mental impairments, as well as ongoing issues with enuresis and encopresis.  While Ms. Beaudo's observations are persuasive as to the claimant's behavior in the home environment, there is no objective evidence as to any significant issues in the school environment.  Rather, the record reflects that the claimant attends school in a regular education classroom and, despite Ms. Beaudo's request, has not been referred for IEP evaluation for academic or behavioral issues.  The claimant testified that he plays soccer with friends during school recess and when at home, spends time playing outside, riding his bike, or playing videogames.  While Ms. Beaudo testified that the claimant does not participate in sports or clubs, she testified that he gets along with his teachers and classmates and participates in gym class.  As noted above, the record reflects continued issues with toileting due to sensory issues; however, Ms. Beaudo testified that the school has been working with her on this issue, and there is no indication that this has resulted in any significant limitations in his activities.  The undersigned carefully considered Ms. Beaudo's observations as to the claimant's behaviors and functional limitations.

(Tr. at 23.)

Plaintiff contends that it was illogical for the ALJ to rely on the absence of an IEP when the school was derelict in its duties, refusing to provide one despite her request and Dr. Sheeter's opinion that HML-B would greatly benefit from an IEP.  (Pl.'s Br. at 17; Tr. at 558; see also Pl.'s Rep. Br. at 14.)  The record contains no evidence that the school improperly denied an IEP.  Plaintiff testified that "they said that he was not eligible through their school system."  (Tr. at 92.)  In any event, even if the ALJ should have avoided the IEP issue, this was a small part of her analysis; she also cited evidence that HML-B attended regular education classes, did well academically, and avoided significant behavioral issues at school.  See Halsell v.

22

<u>Astrue</u>, 357 Fed. Appx. 717, 722-23 (7th Cir 2009) ("Not all of the ALJ's reasons must be valid as long as <u>enough</u> of them are, <u>see, e.g.</u> <u>Simila v. Astrue</u>, 573 F.3d 503, 517 (7th Cir. 2009); <u>Shramek v. Apfel</u>, 226 F.3d 809, 811 (7th Cir. 2000), and here the ALJ cited other sound reasons for disbelieving Halsell.").[4]

Plaintiff also criticizes the ALJ's reliance on HML-B's testimony. The ALJ wrote that HML-B "testified that he plays soccer with friends during school recess and when at home, spends time playing outside, riding his bike, or playing videogames." (Tr. at 23.) Plaintiff notes that HML-B did not testify that he plays soccer at home. (Pl.'s Br. at 17.) Rather, he responded "no" when asked if he played outside with anyone at his house. (Pl.'s Br. at 18; Pl.'s Rep. Br. at 4, citing Tr. at 85.) While a grammarian would likely recommend placement of a comma after the word "recess" in the sentence plaintiff quotes, in context I understand the ALJ to be saying HML-B plays soccer at school; at home, he plays outside, rides his bike, or plays video games. This reading is confirmed by the ALJ's later statement that HML-B "plays soccer with friends at recess." (Tr. at 24.) The court reads an ALJ's decision as a whole and with commonsense rather than nitpicking at it. <u>Castile v. Astrue</u>, 617 F.3d 923, 929 (7th Cir. 2010). In reply, plaintiff argues: "The ALJ felt 'soccer with friends' was a solid basis, or substantial evidence, that supported a finding of 'less than marked' limitations." (Pl.'s Rep. Br. at 4.) The ALJ did not rely solely on "soccer at recess" in finding a less than marked limitation in this domain; she also cited the teacher's report (Tr. at 24) and the agency consultants' opinions (Tr. at 25).

Plaintiff notes that one can be disabled and yet still interact with friends from time to time (Pl.'s Br. at 18; Pl.'s Rep. Br. at 4-5), but I do not read the decision as suggesting otherwise.

---

[4]The ALJ found Dr. Sheeter's July 2021 report vague and unpersuasive regarding the matters at issue. (Tr. at 25.) Plaintiff does not contest this finding.

23

In finding that HML-B had some limitation in this domain, but that it was less than marked, the ALJ balanced his experience at school against the evidence that he had a hard time making friends and spent time at home by himself. (Tr. at 24.) Plaintiff faults the ALJ for overlooking HML-B's testimony alluding to problems with other students at school. (Pl.'s Br. at 18; Pl.'s Rep. Br. at 3, 5.) As indicated in the summary of the hearing testimony set forth above, HML-B declined to elaborate on these problems (Tr. at 86), so it hard to see how the ALJ committed reversible error by failing to discuss this snippet of testimony.

Plaintiff argues that the ALJ's credibility finding failed to resolve the conflict with Dr. Frey's finding of persistent symptoms such as social avoidance and anxiety, and difficulty handling change and new situations. (Pl.'s Br. at 18; Pl.'s Rep. Br. at 5, citing Tr. at 503.) But the ALJ specifically considered this evidence earlier in her decision, finding that while it demonstrated continued limitation in functioning, it did not support a finding of Listing-level severity. (Tr. at 20.) Again, I read the ALJ's decision as a whole in determining whether she considered the important evidence, made the necessary determinations, and gave supporting reasons. Curvin v. Colvin, 778 F.3d 645, 650 (7th Cir. 2015). The ALJ did not cherry-pick only supporting evidence from the record, as plaintiff alleges. (Pl.'s Br. at 19-20, Pl.'s Rep. Br. at 5, 6-7.) For instance, she acknowledged the medical records documenting ongoing issues with toileting, mood variability, and use of anesthesia for dental work. (Tr. at 23.) She further acknowledged—and largely credited—plaintiff's observations regarding HML-B's behavior at home. (Tr. at 23.)

Plaintiff suggests that the ALJ should have given greater weight to her testimony that HML-B had issues with peers at school and exhibited nervous behaviors such as flapping his arms and chewing on his shirt. (Pl.'s Br. at 19; Pl.'s Rep. Br. at 5-6.) But it was not

24

unreasonable for the ALJ to contrast that testimony, which the ALJ acknowledged (Tr. at 22), with the observations of HML-B's teacher, who spent seven hours per school day with him in a classroom setting (Tr. at 22) and observed no difficulties in this domain (Tr. at 24). In reply, plaintiff faults the ALJ for not discussing her testimony about a report of fighting with other children and an incident where HML-B broke a girl's cup. (Pl.'s Rep. Br. at 6.) The ALJ considered plaintiff's testimony about "issue with peers at school" (Tr. at 22); she was not required to discuss all of the details. See Combs, 69 F.4th at 435 (noting that an ALJ need not address every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability).

Plaintiff notes that the teacher's questionnaire said she saw him for "STRIVE." (Pl.'s Br. at 19; Pl.'s Rep. Br at 6, citing Tr. at 335.) According to an education website, the STRIVE (Structured Teaching Reinforced in a Visual Environment) program assists students with autism who need instruction in social skills and opportunities for self-regulation. (Pl.'s Br. at 19.) But the teacher's report indicated that she saw HML-B for a variety of subjects (e.g., math, reading), not just STRIVE, and the record contains no evidence regarding the STRIVE program or how it functioned at HML-B's school. The ALJ did not commit reversible error by failing to sua sponte investigate STRIVE.

Plaintiff faults the ALJ for citing a January 2022 treatment note documenting no issues with attention and concentration at school, overlooking the later statement in this note that "he was having some problems getting into fights with peers on the playground." (Pl.'s Br. at 19-20; Pl.'s Rep. Br. at 6, citing Tr. at 23, 624.) As indicated, an ALJ need not discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability. Deborah M., 994 F.3d at 788; see also Kolar v. Berryhill, 695

25

Fed. Appx. 161, 161 (7th Cir. 2017) ("ALJs need not comment on every line of every physician's treatment notes[.]").  Here, the ALJ acknowledged the testimony that HML-B "continues to have issues with peers at school" (Tr. at 22), but she contrasted that testimony with the teacher's observations and HML-B's statement that he plays soccer with friends at recess (Tr. at 24).  Plaintiff suggests the ALJ placed too much weight on the teacher's report, but ALJs are permitted to rely on such assessments in child disability cases, e.g., McCavitt v. Kijakazi, 6 F.4th 692, 693 (7th Cir. 2021) ("The ALJ was entitled to credit the views of the special-education teacher, who knew N.A.M. well and had a good grasp of gradations among children with intellectual shortcomings."), and a reviewing court may not re-weigh the evidence and substitute its judgment for the ALJ's, e.g., Wilder, 22 F.4th at 651; see also Bakke v. Kijakazi, 62 F.4th 1061, 1068 (7th Cir. 2023) ("This explicit weighing is precisely within the purview of the ALJ—and it is not our place to reweigh evidence, even where reasonable minds might disagree about the outcome.").

Plaintiff concludes that the ALJ failed to document the evaluation required by SSR 16-3p or provide the reasoning required by the caselaw.  (Pl.'s Br. at 20.)  But the ALJ set forth the requirements of § 416.929 and SSR 16-3p (Tr. at 21); reviewed the medical, educational, and testimonial evidence (Tr. at 21-23); and determined that the allegations of disabling symptoms and limitations were inconsistent with the record (Tr. at 22-23).  As indicated, it is appropriate for the court to read an ALJ's decision as a whole in evaluating her findings; doing so does not result in the court inferring reasons or giving the determination a new ground to stand upon; it simply identifies the ALJ's rationale for review.  See Jeske, 955 F.3d at 590; see also Outlaw v. Astrue, 412 Fed. Appx. 894, 897 (7th Cir. 2011) ("RFC determinations are inherently intertwined with matters of credibility, and we generally defer to an ALJ's credibility finding

unless it is 'patently wrong.'").  Plaintiff contends the matter must be remanded for a clear evaluation of the subjective symptoms (Pl.'s Br. at 20-21), but an ALJ need only minimally articulate her justification for rejecting or accepting specific evidence of disability, and the ALJ satisfied that "lax" standard here.  Berger v. Astrue, 516 F.3d 539, 545 (7th Cir. 2008).  Plaintiff believes that an evaluation of all the evidence, under a "reasonably consistent" standard, would show a marked limitation in interacting and relating to others, leading to a disability finding. (Pl.'s Br. at 21-22; Pl.'s Rep. Br. at 14-15.)  As discussed above, the ALJ did not apply an improperly heightened or otherwise incorrect legal standard, and the court may not second guess her weighing of the evidence.  As also discussed above, the ALJ partially credited plaintiff's testimony and adopted findings under the domains somewhat more favorable than either of the agency consultants.  See Burmester, 920 F.3d at 510 ("This finding was more limiting than that of any state agency doctor or psychologist, illustrating reasoned consideration given to the evidence Burmester presented.").

### 2.    Interacting and Relating to Others

Plaintiff argues that the ALJ skipped over important evidence in finding a less than marked limitation in the third domain.  (Pl.'s Br. at 22; Pl.'s Rep. Br. at 7.)  The ALJ stated:

> As to the claimant's ability to get along with others, Ms. Beaudo has reported that the claimant can be argumentative at home, has a hard time making friends, and prefers to spent time alone.  However, the claimant's teacher did not observe the claimant to have any difficulties in this domain.  As noted above, she . . . noted that the claimant is well-mannered, respectful, kind, and sociable.  Further, the claimant testified that he plays soccer with friends at recess.  Thus, while the claimant may have some limitation in this domain, the evidence supports a finding that it is less than marked.

(Tr. at 24.)

Plaintiff cites caselaw holding that an ALJ may not selectively discuss portions of a

27

doctor's report (Pl.'s Br. at 23; Pl.'s Rep. Br. at 7) and must confront evidence that does not support her conclusion (Pl.'s Br. at 24-25). She then quotes from Dr. Frey's discussion of this domain (Pl.'s Br. at 24; Pl.'s Rep. Br. at 8):

> [HML-B] interacts with other children in [an] aggressive manner. He shows interest and appropriate interaction with familiar adults. The child is very shy and reserved. [HML-B] does not engage in parallel play with his peers. Social/play behaviors: forceful, uncooperative play, frequent lining up or unusual structuring of toys, imaginative play. Child has shown the ability to initiate peer interactions. [HML-B] regularly engages with friends in appropriate activities. When things don't go [his] way, he tends to have difficulty dealing with disappointment, hit or kick, destroy property, throw a temper tantrum. If he [doesn't] like what is for [supper] he will throw his plate across the room. Chews on shirt collar when nervous.

(Tr. at 501.) Dr. Frey further noted that, while HML-B's symptoms were less prevalent now, notable symptoms that continued to exist included social avoidance and anxiety, difficulty with reciprocity of conversation, and difficulty with change. Finally, Dr. Frey noted that HML-B is reported to have significant difficulty with peer interactions, has few friends, and tends to be uncooperative and aggressive. (Tr. at 503.) Plaintiff asks: "What of all these findings, are they not telling of marked limitations in the domain of interacting and relating to others?" (Pl.'s Br. at 24; Pl.'s Rep. Br. at 8.)

The ALJ specifically acknowledged the persisting symptoms noted by Dr. Frey. (Tr. at 20.) But the ALJ also noted Dr. Frey's findings that HML-B had age-appropriate social interactions, was able to initiate peer interactions and did not have behavioral issues in the school setting (Tr. at 19), and was able to adapt to the consultative examination after initial nervousness and hesitation (Tr. at 20). The ALJ did not mention every detail of the report, but that is not required. See Gedatus, 994 F.3d at 901 ("True, the ALJ's summary does not mention every detail. But it need not.")

28

Plaintiff further argues that the ALJ skipped over diagnostic findings from Dr. Derek Carlson, HML-B's long-time treating psychiatrist. (Pl.'s Br. at 25; Pl.'s Rep. Br. at 8.) She relies on Dr. Carlson's February 2022 letter, which stated, in full:

> I am [HML-B's] current treating psychiatrist. I have been seeing him since January 2019. His diagnoses are ADHD, combined type, Anxiety disorder, unspecified type, Aggressive behavior in a pediatric patient, DMDD, Sensory integration disorder, Autistic spectrum disorder, Enuresis, Encopresis, Primary insomnia. He continues to work on potty training and isn't full potty trained at this time.

(Tr. at 794.)

Plaintiff notes that Dr. Carlson diagnosed "Aggressive behavior in a pediatric patient, DMDD" (Tr. at 794), then cites the National Institute of Mental Health website discussion of DMDD (disruptive mood disregulation disorder), which can cause children to have significant problems at home and school. (Pl.'s Br. at 25; Pl.'s Rep. Br. at 9.) Dr. Carlson simply listed HML-B's impairments in the letter plaintiff cites; he documented no symptoms related to DMDD. See Sippel v. Saul, No. 20-C-800, 2021 U.S. Dist. LEXIS 80249, at *31 (E.D. Wis. Apr. 27, 2021) ("[T]he Seventh Circuit has rejected the notion that any symptom associated with an impairment is automatically imputed to a claimant who suffers from that condition.") (citing Schmidt v. Barnhart, 395 F.3d 737, 746 (7th Cir. 2005) ("Even assuming the accuracy of Schmidt's unsupported contention that some persons with IBS may experience fatigue, this does not mean that Schmidt suffers this symptom; the ALJ was correct in noting that there is no objective support in the medical records for Schmidt's contention that he suffers from IBS-related fatigue."); Kenealy v. Saul, No. 19-cv-40-jdp, 2019 U.S. Dist. LEXIS 206866, at *14 (W.D. Wis. Dec. 2, 2019) ("[S]he cites online medical information stating that fatigue is a common symptom of multiple sclerosis, which says nothing about Kenealy's own experience

29

of fatigue.")).  The ALJ cited Dr. Carlson's statement that HML-B continued to work on potty training and was not fully toilet trained (Tr. at 23), finding a marked limitation in caring for oneself based in part on difficulties with toileting (Tr. at 24).  Plaintiff develops no argument that the ALJ was required to evaluate the February 2022 letter as a "medical opinion," see 20 C.F.R. § 416.913(a)(2) (noting that a "medical opinion" is a statement from a medical source about what the claimant can still do despite his impairments), and the ALJ otherwise considered the impairments Dr. Carlson listed in this letter.[5]  (Tr. at 20, 794.)

Plaintiff concludes that the ALJ relied on the teacher's report, skipping over other important evidence, including Dr. Frey's consultative findings and Dr. Carlson's diagnostic findings, which showed a marked limitation in the third domain.  She contends that, with the claim hanging in the balance, the ALJ should have provided a more substantial explanation.  (Pl.'s Br. at 25; Pl.'s Rep. Br. at 10.)   However, ALJs are permitted to rely on teacher assessments in child disability cases, McCavitt, 6 F.4th at 693, the ALJ adequately considered Dr. Frey's report, and Dr. Carlson made no specific findings pertinent to this domain.  Accordingly, while the ALJ could have weighed the evidence differently, a reasonable mind

_____

[5]In her response, the Commissioner contends that it was plaintiff's burden to demonstrate, not just the existence of the impairments, but to provide evidence of disabling limitations.  (Def.'s Br. at 11.)  Plaintiff replies that in the child cessation context the Commissioner bears the burden of proof.  (Pl.'s Rep. Br. at 9.)  Plaintiff proceeds to discuss the medical improvement standard, arguing that the ALJ justified cessation here by relying on the teacher questionnaire and evidence that HML-B played soccer with friends.  (Pl.'s Rep. Br. at 9-10.)  Plaintiff did not argue, in her main brief, that the ALJ erred in finding medical improvement; rather, she argued that the ALJ should have found a marked impairment in the third domain.  See, e.g., Carter v. Astrue, 413 Fed. Appx. 899, 906 (7th Cir. 2011) (citing United States v. Lupton, 620 F.3d 790, 807 (7th Cir. 2010)) (holding that arguments raised for the first time in reply are waived).  In any event, the ALJ did not rely solely on recess activities and the teacher's report; she also cited the finding of the consultative examiner that HML-B's "treatment for autism had been effective and that his symptoms were less prevalent than they had been previously."  (Tr. at 19.)

could accept her conclusion.  See Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004) ("Under this standard, the ALJ's decision, if supported by substantial evidence, will be upheld even if an alternative position is also supported by substantial evidence."); Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984) ("The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.").

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is affirmed, and this case is dismissed.  The clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 27th day of September, 2023.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

31

**APPENDIX (SUMMARY OF MEDICAL EVIDENCE)**

In January 2019, HML-B began treating with Dr. Derek Carlson, a psychiatrist, regarding problems with attention, distractibility, aggression, and mood. It was noted that, even with medications, he struggled with focus, impulsivity, and concentration. (Tr. at 559.) Dr. Carlson noted that HML-B never stopped talking the whole time he was in the office, with problems waiting his turn and tendency to interrupt. Dr. Carlson further noted HML-B would lose his temper and become aggressive, usually directed at plaintiff; he hit her several times during the visit. He also chewed on things when anxious and had a tendency to be compulsive. (Tr. at 560.) He was uncomfortable in sensory situations and did not like baths or teeth brushing. (Tr. at 561.) He preferred parallel play to interactive play. (Tr. at 564.) He displayed poor attention and concentration during the visit. (Tr. at 565.) Dr. Carlson adjusted his medications to improve sleep and aggression. (Tr. at 568.)

During a February 2019 follow up with Dr. Carlson, plaintiff reported noticeable improvement in focus; HML-B's behavior was somewhat better as well. (Tr. at 569-570.) He was still sensitive to various things and struggled with incontinence. (Tr. at 571.) Dr. Carlson noted that he was cooperative for the first half of the visit, then started screaming. Nevertheless, although his behavior was not good during the visit, plaintiff reported improvement at school and home. She reported no problems with daily activities other than urinary incontinence. Dr. Carlson increased Focalin. (Tr. at 573.)

In May 2019, plaintiff again noted some improvement in focus. HML-B had no significant meltdowns at school, still some at home, although some improvement. Aggression was improved, and his mood was better. He still wore pull-ups. (Tr. at 576.) Dr. Carlson again adjusted medications. (Tr. at 579.)

In August 2019, plaintiff reported that HML-B did well at summer school. He still had meltdowns, worse when she took him off Abilify; he had less anger when he took it. (Tr. at 581.) He was taking more baths but was not potty trained yet. (Tr. at 582.) On mental status exam, Dr. Carlson noted that HML-B communicated quite well but did not always listen. He did better when on medications. (Tr. at 584.) Attention and concentration during the meeting was good, especially on the blocks, but when the blocks were put away he did not do so well. (Tr. at 584-85.) Dr. Carlson indicated HML-B should stay on medications. (Tr. at 585.)

In December 2019, plaintiff's primary medical provider, Audra Hermanson, APNP, prepared a certificate stating: "[HML-B] has an underlying diagnosis of autism and has an emotional support cat to help him with coping skills. I am requesting that his cat be allowed to be living where ever he is living." (Tr. at 499.) During a well child exam that month, Ms. Hermanson noted that HML-B was in kindergarten, and his teachers did not have any concerns. (Tr. at 488.) He was doing well socially but was not toilet trained. The exam was difficult due to his behaviors, hiding under chairs. (Tr. at 489.)

In January 2020, Dr. Carlson noted that HML-B's ability to focus in school was somewhat better than before, but with room for improvement. The biggest problem occurred when he got home, when he was very distracted, inattentive, and hyperactive; plaintiff wanted an additional dose of medication for that time. She further reported that when told no or something did not go his way, HML-B became aggressive. This was on display in the office, as when told they had to stay longer he started whipping his jacket at her and hitting her. She was able to put him in a teddy bear hold and eventually calmed him. She reported this happened regularly but not often at school. (Tr. at 484.) She further reported HML-B did not like changes to his routine or new experiences. (Tr. at 484-85.) He also engaged in repetitive behaviors. (Tr. at 485.)

33

On mental status exam, he was not very cooperative with the assessment. He wanted to leave, and when he did not get his way became aggressive with plaintiff. Dr. Carlson increased Abilify and added a third dose of Focalin. (Tr. at 487.)

During a July 2020 phone encounter, plaintiff reported fluctuating moods. HML-B had been off Abilify since March because he was doing so well but now was getting angry again and not sleeping well. Dr. Carlson restarted Abilify. (Tr. at 480.)

In September 2020, plaintiff requested a letter for the school regarding assistance with toileting. (Tr. at 476.) Dr. Randall Steinhaus prepared a letter indicating HML-B was not completely toilet trained and needed assistance during his bathroom breaks. (Tr. at 498.)

During an October 2020 phone contact, plaintiff reported that she only gave HML-B Abilify when he was "sassy." The provider advised the medication does not work like that; to be effective, it should be given daily. (Tr. at 540.)

In January 2021, plaintiff reported HML-B refused to take Abilify secondary to taste. He had not taken it for two months, with increased anger outbursts. (Tr. at 532.) During a visit with Dr. Carlson later that month, plaintiff reported Focalin was not working as well as in the past. HML-B had a hard time sitting still and focusing. (Tr. at 527.) He had also been more defiant and argumentative. (Tr. at 527-28.) He was not as aggressive since starting on Depakote but still quick to anger. He was still sensitive to sounds, and they had made no progress on potty training. (Tr. at 528.) On mental status exam, his mood was somewhat variable. Dr. Carlson noted no abnormalities in thought process, content, or association; his attention and concentration were reported to not ideally be where they would like. The school saw some benefit, and they saw some benefit at home but not to the level they would like. Dr. Carlson increased Focalin. (Tr. at 530.)

34

A March 2021 therapy note reported progress had been made, but goals were not met. (Tr. at 522-25.) During an April 2021 session with Dr. Carlson, plaintiff indicated teachers reported HML-B was doing well in school, able to focus and complete tasks. She was not getting calls about academics or behaviors. There were no reports of aggression at school, but he did have outbursts at home. Incontinence was an ongoing issue, and he wore pull-ups. His anger at home was suspected to be due to changes in the environment, as his parents were then living with them. (Tr. at 519.) On mental status exam, his mood was variable. (Tr. at 521.) Attention and concentration were not reported to be impaired at school. Dr. Carlson adjusted medications to help with sleep. (Tr. at 522.)

In April 2021, HML-B saw Ms. Hermanson for a well child exam. (Tr. at 514-15.) He was then in the first grade, and his teachers had no concerns. He was doing well socially. (Tr. at 515.) Ms. Hermanson noted no abnormal findings. (Tr. at 516.)

A May 2021 note indicated HML-B was sleeping without issue on medications. (Tr. at 514.) A psychotherapy note indicated he appeared to be getting comfortable in the therapy room, and they worked on how he could gain more friends. (Tr. at 513.) The note again indicated progress was being made but goals not yet met. (Tr. at 514.) A note from Ms. Hermanson that month indicated potty training was very challenging. (Tr. at 754.)

A June 2021 note from Dr. Carlson indicated HML-B had a difficult time getting ready in the morning. He also continued to anger easily and could be physically aggressive. Such incidents were better, less frequent. (Tr. at 607.) On mental status exam, Dr. Carlson noted no detectable eye contact; HML-B did not want to participate. Dr. Carlson replaced Focalin with Vyvanse to improve attention and concentration. (Tr. at 610-11.)

In July 2021, HML-B underwent a psychosocial assessment with Ashley Sheeter, Psy.D.

35

Plaintiff's biggest concerns were anger issues and potty training. HML-B had meltdowns once or twice per day when he did not get his way or was told no. (Tr. at 555.) She often had to bribe him with toys to get him to do anything. He did not notify when he soiled the pull-up, which caused issues at school. He wore headphones in school to help with the noise. He had a hard time making friends, preferring to play alone. Plaintiff denied academic concerns. (Tr. at 557.) On mental status exam, HML-B appeared restless and irritable, but with logical thought content, good memory, average intelligence, and fair judgment. (Tr. at 556.) Dr. Sheeter diagnosed ADHD and autism disorder, indicating he would be scheduled for a psychological assessment and would greatly benefit from an IEP in school. (Tr. at 558.)

In October 2021, plaintiff told Dr. Carlson the school advised that if they could put HML-B a grade ahead, they would. Vyvanse worked through the school day. He was not hitting plaintiff as often, and she noted a really big improvement; his overall level of anger had subsided. He sometimes had meltdowns but not like in the past. Generally, he appeared to be happier, less moody. (Tr. at 614.) He was doing well at school aside from accidents and resultant teasing. Attention and concentration were reported to be OK. (Tr. at 617.) Dr. Carlson encouraged plaintiff to talk to the school about additional assistance with toileting. They had been able to improve aggression to the point where it was close to extinguished. (Tr. at 618.)

In January 2022, plaintiff told Dr. Carlson HML-B was able to focus at school. She was not seeing increased distractibility at home either. He still had meltdowns when he did not get his way, but she received no reports from school. He bathed infrequently and continued to struggle with potty training. (Tr. at 621.) On mental status exam, Dr. Carlson noted his moods were up and down, but sleep was better. Attention and concentration were not a problem, but

36

he had fights at school.  (Tr. at 624.)  They tried a new medication for outbursts.  (Tr. at 625.)

In February 2022, Dr. Carlson prepared a letter indicating he had seen HML-B since January 2019.  His diagnoses were ADHD, combined type; anxiety disorder, unspecified type; aggressive behavior in a pediatric patient, DMDD; sensory integration disorder; autistic spectrum disorder; enuresis; encopresis; and insomnia.  He continued to work on potty training and was not full potty trained at that time.  (Tr. at 794.)  The record contains a February 2022 referral for bowel training therapy (Tr. at 659) and a February 2022 student transition plan from pull-ups to underwear (Tr. at 403).

A March 2022 note from HML-B's dentist indicated all work needed to be completed under general anesthesia.  (Tr. at 796.)  However, he was noted to be pleasant during an ear exam and audiogram completed that month.  (Tr. at 629-30.)  HML-B was seen at various times for issues with his ears (Tr. at 482, 483, 477, 476, 536, 533-36, 737, 724, 668), but plaintiff does not allege that these issues caused additional limitations.